# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**KAYCE KALAHAR,**
            **Plaintiff,**

            **v.**                                           **Case No. 20-C-0055**

**PRIORITY, INC.,**
            **Defendant.**

## DECISION AND ORDER

The plaintiff, Kayce Kalahar, alleges claims against her former employer, Priority, Inc., under the Family and Medical Leave Act ("FMLA") and the Americans with Disabilities Act ("ADA"). Before me now are the parties' motions for summary judgment.

## I. BACKGROUND

Priority designs and manufactures signs for corporate customers. It has headquarters in Sheboygan, Wisconsin and maintains offices in various locations around the United States. During the time relevant to this suit, Kalahar worked as a project manager in Priority's office in Brookings, South Dakota. Kalahar's primary duty was to manage Priority's relationship with Ameriprise Financial, a company that offers financial planning services.

Kalahar began working at Priority in September 2017. On January 1, 2019, she informed Priority that her father had passed away. Throughout January, Kalahar was in and out of the office. Priority paid Kalahar her usual salary for this period and did not require her to use paid time off ("PTO") or sick time for her absences.

On February 13, 2019, Kalahar contacted Priority's human resources department to request FMLA leave. Kalahar's request was prompted by her chronic depression,

anxiety, and other mental-health issues, which her father's death had exacerbated. Priority understood Kalahar to be requesting intermittent leave as needed to attend therapy appointments and manage flare-ups of her condition. Kalahar's therapist sent Priority a certification stating that Kalahar's conditions would not prevent her from performing the functions of her job but would require her to miss work for regularly scheduled appointments. The certification also stated that, to manage flare-ups, Kalahar would need to take entire days off from work up to four times per month. *See* ECF No. 28-5.

At some point in January or February 2019, Kalahar started working from home at least part time. In mid-February 2019, Priority's customers and vendors began to complain about not being able to reach her by phone or email. Def. Prop. Finding of Fact ("PFOF") ¶ 18.[1] During this time, Kalahar's supervisor, Kallie Johnson, told Kalahar that simply having her email up on her cellphone does not count as working from home. *Id.* ¶ 19. Near the end of February, Priority's Chief Operating Officer ("COO"), Geoff Rosenbaum, received an email from another employee stating that Kalahar was writing "horrible design requests." *Id.* ¶ 20.

---

[1] The plaintiff did not file a response to the defendant's proposed findings of fact. Although the plaintiff's reply brief contains citations to a response to the defendants' proposed findings, the response was never filed. The plaintiff did not correct this apparent error even after the defendant noted the plaintiff's failure to file responses in its reply brief. *See* Reply Br. at 1–3. Thus, for purposes of deciding the defendant's motion for summary judgment, I deem the defendant's proposed findings of facts admitted. *See* Civil L.R. 56(b)(4) ("The Court will deem uncontroverted statements of material fact admitted solely for the purpose of deciding summary judgment."). However, I will still consider the evidence the plaintiff cited in her own proposed findings of fact.

2

On March 12, 2019, Kalahar emailed Priority's HR Generalist, Becky Korff, asking if FMLA can be used for mental health days. *Id.* ¶ 28. Korff said that FMLA can be used for mental health days, but per Priority's policy, Kalahar had to notify Priority when she planned on taking FMLA leave. *Id.* ¶ 29. On March 19, 2019, Kalahar emailed Korff to ask if she could work from home because she was having a bad day. *Id.* ¶ 30. Korff told Kalahar that she could work from home if she notified her supervisor and Korff. *Id.* ¶ 31.

By the end of March, Priority had received additional complaints from customers and other Priority employees about not being able to reach Kalahar when she was working from home. *Id.* ¶¶ 32–34. On March 28, 2019, Korff called Kalahar to inform her of those complaints and to tell her that, as a result, Priority would no longer allow her to work from home. *Id.* ¶¶ 32, 38–40. However, Korff explained that Kalahar could continue to use FMLA time as needed to manage flare-ups. *Id.* ¶ 36. When Kalahar told Korff that she could not afford to take full days of unpaid FMLA leave, Korff told her that she could use PTO and paid sick days when she was having a bad day and needed to stay home. *Id.* ¶¶ 37, 39.

On April 5, 2019, Kalahar's supervisor received an email from Heidi Niedernhofer, the Ameriprise employee responsible for coordinating Ameriprise's relationship with Priority. Niedernhofer stated that Priority hadn't "been doing a great job" for Ameriprise lately and believed that this was because Kalahar was frequently out of the office. ECF No. 28-10. Niedernhofer wrote that she had "gotten quite a few complaints over the past few months regarding [Kalahar]." *Id.* She said the number of complaints over the past three months had exceeded "by far" the total she had received over the past three years. *Id.* Niedernhofer explained that the complaints related to Kalahar's "lack of customer

3

service" and "not being nice to customers." *Id.* She also noted that Kalahar was not being "thorough and accurate." *Id.* Niedernhofer stated that she was aware of Kalahar's situation involving her health and her father's death and said that she "fully support[ed] her taking all the time off she needs." *Id.* Niedernhofer asked that Priority not discipline Kalahar for her recent shortcomings. Instead, she wanted to work with Kalahar's supervisor to find other solutions. *Id.*

On April 8, 2019, Kalahar contacted Korff to tell her that she was having a rough morning and intended to use a half day of FMLA. Korff approved the request. During the same exchange, Kalahar indicated that she had "calls today and other things to get done" that she would do from home even while on FMLA leave. ECF No. 28–11. Kalahar noted that she would take FMLA even though she was working because Priority had previously told her that she could no longer work from home. *Id.* Kalahar then questioned why she had to take unpaid FMLA leave when she was working from home, and Korff told her that she would check with the COO, Rosenbaum, and get back to her. *Id.*

On April 10, 2019, Kalahar did not report to work or call in to explain why she was absent. A few days later, Priority asked Kalahar to participate in a video conference with Rosenbaum, Korff, and Kalahar's immediate supervisor, which took place on April 15. The purpose of the conference was to discuss Ameriprise's complaint and Kalahar's failure to report to work or call in on April 10. During the conference, Rosenbaum reiterated to Kalahar that she needed to work from the office full time and could no longer work from home due to complaints from clients and coworkers regarding her performance. Def. PFOF ¶ 53. At his deposition, Rosenbaum testified that Kalahar was also told that Priority would no longer allow her to take "intermittent FMLA." Rosenbaum

4

Dep. at 18:6–19:21. Kalahar understood this to mean that she either had to take FMLA full time or be in the office full time, *see* Kalahar Dep. at 60:17–60:25, and that she could not take FMLA leave when necessary to manage her flare-ups, First Kalahar Decl. ¶¶ 9–11. However, Priority contends that it did not mean to forbid Kalahar from taking FMLA leave as needed to manage her flare-ups or to attend therapy appointments. *See* Rosenbaum Decl. ¶¶ 8–9. Rosenbaum submitted a declaration in which he states that "there was always an understanding that [Kalahar] could take FMLA leave for appointments and/or mental health days when necessary." *Id.* ¶ 9. But at his deposition, Rosenbaum testified that Priority eventually decided that if Kalahar was "having a bad day," she would not be allowed to "take that day off on FMLA." Rosenbaum Dep. at 40:9–40:18.

When the video conference ended, both Korff and Kalahar's supervisor, Kallie Johnson, made written notes summarizing what was discussed. Korff wrote that Kalahar was told that, because of the complaints about her performance, she either needed to be in the office full time or to "take FMLA fulltime to take care of herself and come back when she's healthy and [could] perform her job duties better." ECF No. 32-1. She wrote that Kalahar responded by noting that she could not afford to take unpaid FMLA full time and therefore would have to try to "handle" being in the office full time. *Id.* Korff's notes reflect that Kalahar was told that she could still take "scheduled time off" to attend her therapy appointments. *Id.* Johnson's notes from the meeting state that Kalahar was "expected to be in the office every day, with the exception of planned time off for appointments, etc." ECF No. 28-12.

5

After the April 15 conference, Kalahar continued to use intermittent FMLA leave. Kalahar took the entire day off on May 6, 2019. Korff Decl. ¶¶ 80–81. She used sick time for half of the day and FMLA leave for the other half. *Id.* ¶ 80. On May 20, 2019, Kalahar emailed Korff to tell her that she had just finished a therapy appointment and needed to take the rest of the afternoon off. ECF No. 28–15. Kalahar said she could provide Priority with a note from her therapist if needed. Korff understood this as a request to use FMLA leave for the afternoon and approved it. Korff Decl.¶¶ 88-89. Korff also advised Kalahar that "a doctor's note was unnecessary because Priority had already approved [her] for FMLA whenever she needed for appointments and/or flare up episodes." *Id.* ¶ 89. On May 22, Kalahar contacted Korff and asked to use FMLA leave during the afternoon of the next day because she was having a hard time at work. ECF No. 28-16. She also asked to be allowed to work from home during the morning because she had to participate in phone conferences, and she noted that were it not for the conferences she would have asked to take FMLA for the full day. Korff responded by telling Kalahar that "FMLA is not a problem for the afternoon" and that she would run her request to work from home during the morning by Rosenbaum. *Id.* However, before Korff was able to do that, Kalahar changed her mind and said that she would report to work.

Kalahar does not point to any specific instance in which she requested to use FMLA leave and Priority denied her request. However, she states that Priority failed to respond to some of her requests to use FMLA, and that she considered a lack of response to be the same as a denial. Kalahar Dep. 35:8–35:11, 55:5–56:13.

On May 8, 2019, Kalahar met with Johnson for a performance review. During the review, Johnson gave Kalahar a list containing areas of improvement, such as "no client

6

complaints." ECF No. 28-14. The list also stated: "Working from home isn't an option. Must be in the office everyday with the exception of planned absences (PTO). Scheduled appointments need be made up." *Id.* Kalahar states in her deposition that she understood this to mean that if she had a doctor's appointment for her depression or anxiety, she would have to make up the time that she missed. Kalahar Decl. ¶ 10. During her deposition, Kalahar indicated that she thought she would have to make up the time only if she wanted to be paid. *See* Kalahar Dep. at 36:21–36:22 ("I was told that I had to make up the time that I used for FMLA if I want to be paid."). She also testified that she would not have had to have made up the time if she used paid sick leave or PTO. *Id.* at 67:1–67:3, 69:5–69:6.

On June 3, 2019, Priority terminated Kalahar's employment. The decision to terminate was initiated by Johnson with input from Korff, and then approved by Rosenbaum. *See* Rosenbaum Dep. at 17:13–18:1. Priority states that it terminated Kalahar due to her poor performance.

After terminating Kalahar, Priority learned of two additional customer complaints about her performance. One customer tried to contact Kalahar to address a problem with her order. When Kalahar's replacement informed the customer that Kalahar had been terminated, the customer said, "ok . . . no surprise there since [she] did not seem to be able to get a simple order correct." ECF No. 28-17. Another customer complained that Kalahar had not handled his service requests properly. ECF No. 28-18.

Following her termination, Kalahar commenced this action against Priority, alleging that it interfered with her rights under the FMLA and retaliated against her for taking FMLA leave. She also alleges that Priority terminated her in violation of the ADA because it

7

failed to reasonably accommodate her depression and anxiety. Kalahar has filed a motion for summary judgment on all her claims in which she contends that the record establishes that Priority is liable under both the FMLA and the ADA. Priority, in turn, has filed its own motion for summary judgment on all claims in which it contends that the record would not permit a reasonable jury to find in Kalahar's favor.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

### A.    FMLA Claims

The FMLA generally provides eligible employees suffering from a serious medical condition with as many as twelve weeks of unpaid leave during any twelve-month period. 29 U.S.C. § 2612(a)(1)(D). Employers are prohibited from both interfering with, *id.* § 2615(a)(1), and retaliating against, *id.* § 2615(a)(2), an employee's use or attempted use of FMLA leave. Kalahar brings both interference and retaliation claims.

#### 1.    FMLA Interference

To establish an FMLA interference claim, Kalahar must show that: (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled. There is no dispute that Kalahar has satisfied the first three elements. However, Priority

8

contends that Kalahar cannot show that it denied her any FMLA leave that she requested, and that therefore she cannot satisfy the fourth and fifth elements. Kalahar contends that a reasonable jury could not fail to find in her favor on all five elements.

In her FMLA interference claim, the plaintiff focuses primarily on the statements Priority made to her during the April 15 meeting and after. First, she contends that Priority's telling her that she either had to use FMLA full time or work full time amounted to FMLA interference because the FMLA protects an employee's right to take intermittent leave when medically necessary to care for her own serious health condition. *See* 29 U.S.C. § 2612(b); 29 C.F.R. § 825.202. Second, she contends that Priority interfered with her FMLA leave by telling her she had to make up the FMLA time she used when she attended therapy appointments. I first address whether the evidence supports Kalahar's claim that Priority interfered with her FMLA rights by prohibiting her from taking intermittent leave. I then address whether Priority interfered with her FMLA rights by requiring her to make up the FMLA time she used to attend appointments.

As to the first issue, I find that the plaintiff has met her burden to produce evidence showing that Priority told her that she could not take intermittent FMLA leave and had to either work full time or take FMLA full time. At his deposition, the company's COO, Geoff Rosenbaum, admitted that he made these statements to Kalahar during the April 15 meeting. He testified as follows:

> [I]it was presented as you can go on full-time FMLA or work full-time, either way, but we—the intermittent FMLA and her performance during that time had not been working, so we were asking her to either come back to work and we'll help you every way we can or take full-time FMLA if that's what you need to get yourself healthy. That's how it was presented to her.

9

Rosenbaum Dep. at 19:13–19:21. Further, the written notes of the April 15 meeting that were prepared by the HR representative, Korff, and Kalahar's supervisor, Johnson, each reflect that Kalahar was told that she either needed to take FMLA full time or work full time. *See* ECF Nos. 32-1 & 28-12. Priority observes that both Rosenbaum and Korff have submitted declarations in which they state that "no one from Priority" told Kalahar during the meeting that she could not use FMLA leave for appointments and/or mental health days if flare-ups occurred. *See* Rosenbaum Decl. ¶ 70; Korf Decl. ¶ 8. However, in light of Rosenbaum's deposition testimony and Korff's and Johnson's written notes, there is at least a genuine factual dispute over whether Priority told Kalahar at the meeting that she could no longer use FMLA leave on an intermittent basis and instead could only take full-time leave.[2]

However, the evidence shows that, after the April 15 meeting, Kalahar continued to request and receive intermittent FMLA leave to manage flare-ups. Kalahar took the entire day off on May 6, 2019, using a half day of sick time and a half day of FMLA leave. Def. PFOF ¶ 67; Korff Dec. ¶¶ 80–81. She used a half-day of FMLA leave on May 20,

---

[2] Kalahar contends that, in light of their deposition testimony, I must disregard Rosenbaum's and Korff's declaration statements about what she was told at the April 15 meeting under the "sham affidavit" rule, which prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony. *See, e.g., James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). She further contends that, when the declaration statements are disregarded, the only reasonable conclusion is that she was told that she could no longer take intermittent leave, and that therefore she is entitled to summary judgment on her interference claim. However, as I explain in more detail below, the evidence shows that Kalahar was able to take intermittent FMLA leave after the April 15 meeting, and this gives rise to a genuine factual dispute over whether Priority's statements at the meeting resulted in a denial of her right to take intermittent leave. Thus, even if I disregarded the declaration statements under the sham affidavit rule, Kalahar would not be entitled to summary judgment on her FMLA interference claim.

10

2019. Def. PFOF ¶¶ 73–74. When Kalahar offered to provide a doctor's note explaining why she needed to use leave, Korff told her that "a doctor's note was unnecessary because Priority had already approved [her] for FMLA whenever she needed for appointments and/or flare up episodes." *Id.* ¶ 74; Korff Decl. ¶ 89. On May 22, Kalahar asked Korff if she could use FMLA during the afternoon of the 23rd because she was having "really hard days at work." ECF No. 28-16. Korff told Kalahar that "FMLA is not a problem for the afternoon." *Id.* Although Kalahar ultimately chose to report to work that afternoon, she does not contend that she did so because Priority refused her request to use FMLA leave.

Because Kalahar continued to request and receive intermittent FMLA leave after the April 15 meeting, Kalahar is not entitled to summary judgment on her claim that Priority interfered with her rights under the FMLA by prohibiting her from taking intermittent leave. At the same time, however, Priority is not entitled to summary judgment on this claim. Although Priority contends that it granted every FMLA request Kalahar made after April 15, Kalahar testified at her deposition that she made requests for FMLA leave that Priority ignored. Specifically, when Priority's counsel asked Kalahar whether she was ever denied FMLA leave, she responded, "There were times no one would respond back to me, so I didn't know if they would approve it, so I would just go into the office." Kalahar Dep. at 35:8–35:11. Although Kalahar does not identify any specific instance in which one of her requests to use FMLA leave was ignored, her general testimony about being ignored, when combined with the evidence that she was told at the April 15 meeting that she could no longer take intermittent FMLA leave, would allow a reasonable jury to find that Priority

11

interfered with Kalahar's right to take intermittent FMLA leave.[3] Accordingly, neither party is entitled to summary judgment on this FMLA interference claim.

Kalahar's remaining FMLA interference claim is based on her belief that Priority required her to make up any FMLA time she used to attend therapy appointments. The evidence in the record shows that Kalahar's supervisor told Kalahar that "[s]cheduled appointments need be made up." ECF No. 28-14. Further, in her declaration, Kalahar states that, on April 15, 2019, Rosenbaum told her that "if [she] had a doctor's appointment for [her] depression or anxiety [she] would have to make-up the time [she] missed." First Kalahar Decl. ¶ 10. Finally, Kalahar also cites Rosenbaum's deposition testimony, in which he states that Priority's "typical policy" is to have people make up any work time they miss because of appointments. Rosenbaum Dep. at 51:11–51:19.

Although the above evidence shows that Priority required Kalahar to make up the time she used to attend therapy appointments, none of it indicates that Priority would have required her to make up the time if she had used *unpaid* FMLA leave for the appointments. To the contrary, Kalahar's own deposition testimony establishes that

---

[3] Priority contends that Kalahar's claim that she made FMLA requests that were ignored is "not supported by any evidence." Reply Br. at 6. However, Kalahar testified at her deposition that she made requests that Priority ignored, and that is sufficient evidence to avoid summary judgment. *See, e.g., Johnson v. Advocate Health & Hosp. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018) ("self-serving testimony is an acceptable method for a nonmoving party to present evidence of disputed material facts"). Priority also contends that Kalahar's requests for FMLA leave were made exclusively by email, instant messaging, or text message, and that Kalahar has not produced any email, instant message, or text containing an FMLA request that was ignored. However, this point goes only to the credibility of Kalahar's testimony; it does not prevent a jury from believing her when she says that she made FMLA requests that were ignored. It is possible that Kalahar made these requests orally or in text messages or other written communications that were not preserved.

12

Priority wanted her to make up the time only if she expected to be paid. At her deposition, Kalahar testified that she was told that she "needed to make up the time if [she] was using FMLA." Kalahar Dep. at 35:15–35:16. However, a short time later, she testified that what she was actually told was that she "had to make up the time that [she] used for FMLA if [she] want[ed] to be paid." *Id.* at 36:21–36:22. Later on in the deposition, Kalahar gave additional testimony that confirmed that the requirement to make up time applied only if Kalahar wanted to be paid by noting that the requirement did not apply if she used paid leave. *Id.* at 67:1–67:3 (testifying that she had to make up appointments unless she "used PTO"); *id.* at 69:5–69:6 (testifying that she had to make up time if she "didn't use PTO or sick time"). Nothing in Kalahar's deposition or declaration states that if she elected to use unpaid FMLA leave for an appointment, Priority would have required her to make up that time. Likewise, Rosenbaum's deposition testimony does not indicate that Priority would have required Kalahar to make up time related to unpaid FMLA leave. After testifying that Priority's "typical policy" was to ask employees to make up work missed due to appointments, Rosenbaum indicated that FMLA leave might be treated differently. When Kalahar's counsel asked him whether Kalahar had to make up work missed for appointments "even if it was covered by the FMLA," Rosenbaum testified that he could not recall whether Priority discussed how the FMLA related to the requirement to make up time. Rosenbaum Dep. at 51:20–52:1.

FMLA leave is, of course, unpaid leave. *See, e.g., Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). Thus, requiring an employee to make up missed working hours in order to be paid for the time does not deny the employee an FMLA benefit. *See Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 498 (7th

13

Cir. 2014) (noting that FMLA leave is unpaid and that an employee's request relating to paid time does not implicate the FMLA). Because Kalahar presents no evidence from which a reasonable jury could find that Priority prevented her from taking unpaid FMLA leave for her appointments unless she made up the time, Priority is entitled to summary judgment on this aspect of her interference claim.

### 2. FMLA Retaliation

To establish an FMLA retaliation claim, Kalahar must show: (1) she engaged in statutorily protected activity; (2) the employer took adverse action against her; and (3) the protected activity caused the adverse action. *Freelain*, 888 F.3d at 901. There is no dispute that Kalahar engaged in statutorily protected activity by requesting and using FMLA leave. Further, there is no dispute that Kalahar's termination was an adverse action. The issue is whether the evidence would permit or, in the case of Kalahar's motion for summary judgment, compel a reasonable jury to find a causal connection between the use of FMLA leave and the termination.

Kalahar contends that a jury could find a causal connection between her use of leave and the termination because the evidence suggests that Priority's stated reason for terminating her—poor performance—is pretextual. However, there is very little evidence in the record suggesting that Priority's claim that it terminated her for performance reasons is pretextual. As I discussed in the background section, the record is replete with complaints from customers and coworkers about Kalahar's performance, including from Kalahar's most important customer, Ameriprise. Priority even received complaints about her performance after she was terminated. *See* ECF Nos. 28-17 & 28-18. Kalahar contends that, for two reasons, a reasonable jury could deem Priority's reason pretextual:

14

(1) no customers complained about Kalahar's performance after May 8, the day on which her supervisor gave her guidelines for improvement, and (2) Priority did not put her through its progressive discipline program before terminating her.

As to the first reason, even if it is true, it does not give rise to a reasonable inference that Priority did not terminate Kalahar due to her performance. During the May 8 conference, Kalahar's supervisor identified several areas that needed improvement, only one of which related to client complaints. *See* ECF No. 28-14. Further, Korff, the human resources employee, identified various forms of poor performance unrelated to client complaints that resulted in Kalahar's termination, including "just declining overall work, internal work as far as drawings and things like that." Korff Dep. at 16:25–17:6. Thus, Priority's having terminated Kalahar even though she did not receive new customer complaints after May 8 was not suspicious.

As to the second reason, the plaintiff notes that Priority has a written progressive discipline policy with several steps, including placing the employee on a performance improvement plan that involves weekly meetings over a 90-day period. She notes that although Kalahar's supervisor met with her on May 8 and gave her areas of improvement, Priority did not follow all the steps of its policy before terminating her. The Seventh Circuit has acknowledged that "[s]ignificant, unexplained or systematic deviations from established policies or practices can no doubt be relevant and probative circumstantial evidence of discriminatory intent." *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012). However, in the present case, the evidence does not suggest that Kalahar's termination amounted to a "significant, unexplained or systematic deviation" from an established policy. Although Priority did not follow its progressive discipline policy to the letter, it did

15

warn Kalahar about her slipping performance three times before terminating her: (1) in March, when it told her she was receiving complaints and could no longer work from home, (2) at the April 15 meeting, and (3) during the May 8 performance review. Further, the policy itself states that Priority is not obligated to follow it in every case. The policy states that Priority is "not obligated to follow any disciplinary or grievance procedure and that depending on the circumstances, [the employee] may be disciplined or terminated without any prior warning or procedure." ECF No. 28-2 at 65. Finally, Kalahar cites no evidence suggesting that Priority always rigidly followed its progressive discipline policy with employees who did not exercise their rights under the FMLA. Thus, Priority's failure to follow its policy before terminating her does not give rise to a reasonable inference that Priority's reason for the termination is pretextual.

Although a reasonable jury could not find that Priority's reason for terminating Kalahar was pretextual, it could find that Priority's reason was causally connected to her use of FMLA leave in a different way. A large part of Kalahar's performance issues stemmed from her absences from the office. Indeed, Ameriprise's representative identified Kalahar's frequent absences in her email complaining about Priority's recent performance. *See* ECF No. 28-10 ("Kayce is out of the office a lot and orders are dragging because of it."). Further, the record suggests that Priority did not have other employees cover Kalahar's duties while she was on FMLA leave. Kalahar herself notes that she forwarded her phone calls to the office during her leaves, and that no one in the office answered or responded to those calls. Second Kalahar Decl. ¶ 5. If Kalahar's performance issues were caused by Priority's failure to have another employee cover her responsibilities while she was on FMLA leave, then Priority could not terminate her for

16

those performance issues without violating the FMLA. *See Pagel v. TIN Inc.*, 695 F.3d 622, 629 (7th Cir. 2012) (stating that the FMLA "can require that performance standards be adjusted to avoid penalizing an employee for being absent during FMLA-protected leave"); *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 743 (7th Cir. 2008) (holding that jury could find that employer violated the FMLA if the employer "held [the employee] to the unrealistic expectation that she should accomplish satisfactorily all of the duties of [her] position during her period of FMLA-protected intermittent leave"). Unlike the ADA, which protects an employee only when she is able to perform the essential functions of her position with or without reasonable accommodation, the FMLA *excuses* an employee from having to perform the essential functions of her position during the period of leave. *See Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) ("The FMLA protects up to 12 weeks of medical leave, recognizing that employees will sometimes be *unable* to perform their job duties due to a serious health condition. In contrast, 'the ADA applies only to those who can do the job.'"). Thus, if the performance problems that supposedly justified Kalahar's termination were a direct result of her using FMLA leave, then allowing Priority to terminate her for those reasons would render her FMLA rights "illusory." *Pagel*, 695 F.3d at 629.

As discussed above, there is evidence that Kalahar's performance issues were caused by her use of FMLA leave and Priority's failure to have someone fill in for her while she was on leave. Rosenbaum even made a statement during his deposition indicating that Kalahar's performance was poor because she used intermittent FMLA leave and no one else was completing her work. *See* Rosenbaum Dep. at 18:23–19:2 ("We had initially approved an intermittent FMLA, and her performance during that time

17

was poor, and we were trying to look for options that would allow her to get healthy but at the same time allow us to make sure that work was being completed."). Thus, Priority is not entitled to summary judgment on Kalahar's retaliation claim. However, at the same time, the evidence is not so favorable to Kalahar as to require entry of summary judgment in her favor. During the five months preceding her termination, Kalahar took forms of leave that were not protected by the FMLA, including PTO and paid sick time. So even if Kalahar's performance issues were caused by her absences, a jury would not be compelled to find that those performance issues were caused by her use of FMLA-protected leave. Moreover, the record does not conclusively establish that all Kalahar's performance issues related to her use of leave. Some of the problems related to her attitude (such as "not being nice to customers," ECF No. 28-10 at 1) and to her doing poor "internal work," Korff Dep. at 16:23–17:6. For these reasons, it would be reasonable for a jury to find that Kalahar's performance issues and eventual termination were not caused by her use of FMLA leave. Accordingly, neither party is entitled to summary judgment on Kalahar's retaliation claim.

## B.    ADA Claims

Kalahar alleges that her termination also violated the ADA, which makes it unlawful for an employer to discriminate against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). Kalahar contends that her anxiety and depression were disabilities, which Priority failed to reasonably accommodate. Priority disputes that Kalahar's anxiety and depression were disabilities

18

and that, if they were, she requested a reasonable accommodation. However, I need not address these issues because, even if Kalahar was disabled and requested an accommodation, she has not produced evidence showing that Priority could have provided her with a reasonable accommodation that would have enabled her to perform the essential functions of her position.

The plaintiff bears the burden of showing that she is a "qualified individual," and, when the plaintiff alleges failure to accommodate, her burden includes showing that "she would have been able to perform the essential functions of her job with a reasonable accommodation." *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013). In the present case, Kalahar identifies two potential accommodations: (1) "continu[ing] [her] intermittent FMLA," Br. in Supp. at 9; and (2) subjecting her to "the progressive discipline policy that is afforded to non-disabled employees," Reply Br. at 12. However, no evidence in the record suggests that either of these potential accommodations would have enabled her to perform the essential functions of her job.

First, it is awkward to describe "intermittent FMLA" as a potential reasonable accommodation. As discussed above, the FMLA already protects an employee's right to take intermittent leave, and therefore the employee does not need to resort to the ADA to obtain such leave. Although FMLA leave is limited to twelve weeks every twelve months, Kalahar does not suggest that she would have needed more than twelve weeks of intermittent leave. Kalahar's therapist indicated in her medical certification that she would need to take up to four days of leave per month to manage flare-ups. *See* ECF No. 28-5 at 4. Even if Kalahar used four days each month, that would add up to less than seven

19

weeks per year, leaving five weeks of FMLA leave that Kalahar could have used to attend therapy appointments.

Perhaps Kalahar is arguing that because Priority allegedly interfered with her FMLA right to take intermittent leave, it also violated the ADA's requirement to provide a reasonable accommodation. Again, however, I fail to see the point of bringing a separate claim under the ADA, for the FMLA already provides a remedy for any denial of intermittent leave, and the ADA requires the plaintiff to prove additional elements that the FMLA does not, including that she is disabled, that intermittent leave would have been a "reasonable" accommodation, and that intermittent leave would have enabled her to perform the essential functions of her job. In any event, the plaintiff has not produced evidence that would allow a reasonable jury to find in her favor on the last element. As discussed in the background section and in connection with Kalahar's FMLA claims, while Kalahar was using intermittent leave in January through mid-April of 2019, she was unable to satisfactorily perform many of the essential functions of her position, including timely responding to customer inquiries, which resulted in client complaints. No evidence in the record suggests that, had Priority granted her a few additional days of intermittent leave in April and May of 2019, her performance would have improved. Of course, as I discussed, the FMLA required Priority to either have someone cover Kalahar's duties while she was on leave or not hold her responsible for any errors or client complaints that occurred while she was using FMLA leave. But the same is not true of the ADA. To obtain intermittent leave as a reasonable accommodation, an employee must be able to perform the essential functions of the position, and an inability to do so would prevent the employee from being a "qualified individual." *See Byrne v. Avon Prods., Inc.*, 328 F.3d

20

379, 381 (7th Cir. 2003). Because a reasonable jury could not find that Kalahar could have performed the essential functions of her job while using intermittent leave, Priority is entitled to summary judgment on her claim that the alleged denial of such leave violated the ADA.

Kalahar also contends that Priority should have accommodated her by using its formal progressive discipline policy. However, Kalahar does not explain how the progressive discipline policy would have helped her overcome the effects of her anxiety and depression. She merely states in conclusory fashion that, had Priority applied the policy to her, she could have performed up to company expectations. *See* Second Kalahar Decl. ¶ 7. But such a conclusory assertion is not sufficient to establish that the accommodation would have been successful. *See Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 289 (7th Cir. 2015) (recognizing that, when opposing summary judgment, plaintiffs cannot rely "upon a conclusory and untested opinion/hope that the proposed treatment/accommodation would enable them to perform the essential functions of their jobs").[4] Moreover, as I discussed in connection with Kalahar's FMLA claims, although Priority did not follow its progressive discipline policy to the letter, it still applied aspects of the policy to her by warning her about her slipping performance and providing her with a list of areas of improvement. Kalahar does not explain how rigidly applying the discipline policy to her would have enabled her to perform the essential functions of her job. Thus,

---

[4] For the same reason, I must disregard Kalahar's conclusory assertion in her declarations that she could have adequately performed her job had Priority allowed her to continue taking intermittent FMLA leave. *See* First Kalahar Decl. ¶ 17; Second Kalahar Decl. ¶ 7.

21

a reasonable jury could not find that Priority's failure to strictly follow the policy amounted to a denial of a reasonable accommodation.

Finally, I note that Kalahar suggests that Priority failed to engage in the ADA's interactive process by not considering "other accommodation options." Br. in Supp. at 9. However, "the failure to engage in the interactive process required by the ADA is not an independent basis for liability under the statute, and that failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual." *Basden*, 714 F.3d at 1039. "Even if an employer fails to engage in the required process, that failure need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation." *Id.* As discussed, Kalahar's evidence would not permit a reasonable jury to find that an accommodation would have allowed her to perform the essential functions of her job. Thus, I need not consider Kalahar's suggestion that Priority failed to engage in the interactive process.

### III. CONCLUSION

In sum, Kalahar is entitled to proceed to trial on: (1) an FMLA interference claim alleging that Priority prevented her from taking intermittent FMLA leave; and (2) an FMLA retaliation claim alleging that her termination for poor performance was causally connected to her use of FMLA leave due to Priority's failure to cover for her while she was using such leave. Priority's motion for summary judgment will be denied with respect to these claims. However, Priority's motion will be granted with respect to Kalahar's FMLA interference claim to the extent it is based on her claim that she had to make up FMLA leave taken to attend therapy appointments, and with respect to her FMLA retaliation

22

claim to the extent it alleges that her termination for poor performance was pretextual. Further, Priority's motion will be granted as to all claims under the ADA. Kalahar's motion for summary judgment will be denied in its entirety.

For the reasons stated, **IT IS ORDERED** that Priority's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Kalahar's motion for summary judgment is **DENIED**.

Dated at Milwaukee, Wisconsin, this 3rd day of February, 2021.


s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge